UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-CR-60099-RAR

**UNITED STATES OF AMERICA**

vs.

**WISHGUE FRAGE,**[1]

   **Defendant.**
_____/

**REPORT AND RECOMMENDATION**

  THIS CAUSE comes before the Court on Defendant Wishgue Frage's Motion to Suppress ("Motion") [DE 12], which has been referred to me by the Honorable Rodolfo A. Ruiz. [DE 13]. The Motion seeks to suppress physical evidence seized from the Defendant's automobile on February 28, 2020.[2] I have reviewed the Motion and the Government's Response. [DE 17].[3] On September 28, 2021, I held an evidentiary hearing at which the parties presented testimony, evidence, and arguments on the Motion. Being fully advised in the premises, I respectfully **RECOMMEND** that the Motion be **DENIED**.

  **I.**  **FINDINGS OF FACT**

  Based on the testimony and evidence presented at evidentiary hearing on September 28, 2021, I make the following findings of fact. The evidence presented consisted of the testimony of Broward Sheriff's Office (BSO) Deputy Ricardo Valdes and two Government Exhibits containing video and audio from Deputy Valdes's "body camera."[4] Having had the opportunity

---

[1] The docket shows Defendant's last name as "Frague." However, the charging Information and Defendant's motion spell his last name as "Frage."
[2] The introduction to the Motion refers to the date of May 6, 2016. However, it is clear from the rest of the Motion and the evidence presented at the hearing that this is a typographical error and that the events in question occurred on February 28, 2020.
[3] The Defendant did not file a Reply.
[4] The body camera footage displayed a continuous time stamp in 24-hour hh:mm:ss format (e.g. 14:51:00 instead of

to observe Deputy Valdes's testimony, in conjunction with the body camera footage, I find his testimony to be credible. This credibility determination has informed several of my findings of fact, as discussed more fully below.

On February 28, 2020, Deputy Valdes was on road patrol. While completing a traffic stop in an unrelated incident, at approximately 14:51 (per the body camera footage) Deputy Valdes received a "be on the lookout" (BOLO) via radio from his dispatcher. The BOLO initially indicated that there was suspicious incident involving a white Mazda[5] automobile at 7920 Hampton Boulevard in North Lauderdale. This address is part of a complex of multiple buildings and parking lots. Deputy Valdes quickly drove towards the apartment complex that included 7920 Hampton Boulevard, which was nearby. At approximately 14:53, Deputy Valdes informed the dispatcher that he was arriving at the area of the address reported in the BOLO. By that point, Deputy Valdes had received an update on the BOLO through notes on the computer screen in his vehicle. This update reported that the white Mazda was believed to be involved in a burglary or an attempted burglary, specifically that someone in the white Mazda was going around trying to open doors of other vehicles.

As Deputy Valdes was arriving near the reported Hampton Boulevard address, various law enforcement units were trying to set up a perimeter around the property to contain the subject of the BOLO report. Deputy Valdes was looking for the reported white Mazda while driving around the exterior of the property's parking lot. At approximately 14:54, Deputy Valdes saw a white

---

2:51 p.m.). References to time herein are based on the time displayed by the body camera footage. Although in certain instances I cite the time displayed with the seconds included, for simplicity sake I will frequently cite only the hour and minutes. The relevant part of Government's Exhibit 1 began at approximately 14:51 and ended at 15:00. Government's Exhibit 2 began immediately thereafter.

[5] At 14:51:31 on the body camera footage, the dispatcher can be heard to describe the subject vehicle as a "white Mazda." Although the dispatcher later (around 14:52) says "white vehicle," at 14:52:39, the dispatcher again audibly says that the subject vehicle is a "white Mazda." Therefore, it is clear that the BOLO informed Deputy Valdes to specifically look for a "white Mazda."

Mazda driving slowly around the parking lot and reported this observation to the dispatcher. This was the first (and only) white Mazda he had seen on the premises. He observed the vehicle move towards the exit of the parking lot. Therefore, Deputy Valdes drove to the exit and entered the parking lot, such that his vehicle and the white Mazda were "nose-to-nose" a few feet apart. Deputy Valdes observed that the driver of the white Mazda (later identified as the Defendant) was not wearing a seat belt.[6] The Defendant quickly made a left turn and then turned left again into a nearby parking space.

Deputy Valdes got out of his vehicle and approached the Defendant's vehicle. The Defendant opened his driver's door as the Deputy approached. The Deputy recognized the odor of marijuana coming from the car.[7] After Deputy Valdes commented about the smell of marijuana (asking something to the effect of "how much did you smoke in this car?"), the Defendant said that he had smoked earlier but not in the car. Deputy Valdes asked the Defendant to get out of the white Mazda, believing he had probable cause to believe that the vehicle contained additional evidence of possession of marijuana. No one else was in the white Mazda. By this time, another BSO deputy, Deputy Saintilus, had arrived. Deputy Saintilus handcuffed the Defendant and said

---

[6] On cross-examination and in argument, defense counsel questioned whether Deputy Valdes had actually observed the Defendant not wearing a seatbelt by pointing out that Deputy Valdes did not inform the dispatcher or other officers by radio of this observation. However, I find this fact unremarkable and not probative of whether Deputy Valdes truly observed the lack of a seatbelt. As Deputy Valdes testified, he would not ordinarily give a "play-by-play" of his actions nor would he ordinarily report to others the lack of a seatbelt. I find that explanation to be credible, particularly in this case, where Deputy Valdes made the observation while turning and then driving nose-to-nose with the Defendant's car. I similarly find it unremarkable that Deputy Valdes did not address the seatbelt issue with the Defendant, as the smell of marijuana, as well as the suspicion that the Defendant's vehicle matched the BOLO, clearly escalated the traffic stop in another direction as soon as the Deputy approached the Defendant's vehicle. In short, Deputy Valdes was clearly in a position to observe whether the Defendant was wearing a seatbelt when their vehicles were "nose-to-nose," and I credit his testimony that he saw the Defendant not wearing a seatbelt.

[7] Deputy Valdes testified that he had spent several years focusing on narcotics cases as part of a crime suppression team and, between his crime suppression team experience and his road patrol duties, had made more than fifty (50) arrests involving marijuana. During argument, defense counsel conceded that he had "no reason to disbelieve" the Deputy's testimony that he smelled marijuana. On cross-examination, Deputy Valdes admitted that he could not necessarily distinguish between the smell of marijuana and hemp. However, he also testified that the Defendant said he did not smoke hemp, from which Deputy Valdes concluded that the smell was marijuana.

something to the effect that the Defendant "reeked of weed" or "smelled of weed." Deputy Valdes observed two burnt marijuana cigarettes in the center console area of the white Mazda.[8]

At 14:55, the deputies conducted a "pat down" of the Defendant and found a small baggie, containing approximately half of a gram of marijuana in his front pants pocket.[9] At 14:57, the dispatcher relayed over the radio a license plate number for the vehicle that was the subject of the BOLO, apparently provided by whomever had called 911. The license plate number matched the license plate on the Defendant's white Mazda.

At approximately 14:58, Deputy Valdes began searching the inside of the white Mazda. Deputy Valdes testified that, at this point, the Defendant was under arrest for possession of cannabis and that he started searching the car for cannabis. Shortly after beginning his search, Deputy Valdes found multiple credit cards or identification cards bearing names other than the Defendant's. He initially found three cards but then discovered more than five cards. Although the body camera video does not show this discovery, as the camera was pointed towards the back rest of the driver's seat, Deputy Valdes can be heard saying "that's a felony," in reference to section 817.5685(3)(b)1, Florida Statutes (2020), Florida's statute criminalizing possession without authorization of identification information of five or more people. Soon thereafter, the video shows the deputy holding a Florida driver's license with a corner cut off (which typically indicates that the license has expired or been replaced) belonging to a "Richard Lewis." The search

---

[8] Although these marijuana cigarettes were never visible on the body camera video, Deputy Valdes's testimony is corroborated by audio heard later during the search of the vehicle. Around 14:58, a deputy can be heard saying "there's a roach in there." "Roach" is a common slang term for a marijuana cigarette. Around 15:00, Deputy Valdes can be heard exclaiming, "Ah f--- me, I touched that roach! Tiny little roach." At the same time, another deputy in the background says, "There's two of them." At 15:01 (near the start of Government's Exhibit 2), Deputy Valdes and another deputy can be heard commenting on the continuing "strong smell of marijuana" as they continued searching the vehicle. Thus, I credit Deputy Valdes's testimony that he observed a strong odor of marijuana coming from the vehicle and observed two burnt marijuana cigarettes in the center console.

[9] The substance tested positive for marijuana in a field test. However, there is no indication from the testimony or the body camera video when this field test occurred. For the sake of these findings of fact, I presume that the substance was not field tested until after the search of the white Mazda began.

ultimately located approximately thirty-four (34) credit cards or identification cards in the names of people other than the Defendant. Deputy Valdes testified that he recognized what the credit cards and identification cards were as soon as he saw them.

After the Deputy Valdes found at least five of the cards, he continued searching the vehicle. In the center console, he found and reviewed various paper receipts. Notably, there was a large screen television in the back seat of the vehicle. At approximately 15:06, Deputy Valdes found various pieces of mail addressed to people other than the Defendant. At 15:07, another deputy opened the vehicle's trunk and immediately discovered an embossing machine, which is used to stamp names and numbers on plastic cards (such as credit cards). On the video, one deputy notes that it is a "credit card machine" and also that "it reeks of weed in here." In total, the search of the white Mazda found thirty-four (34) credit cards or identifications, the embossing machine, eighteen (18) or nineteen (19) blank plastic cards, mail belonging to various other people, the receipts, and a small vial of THC oil.

## II.　ANALYSIS

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Defendant argues that Deputy Valdes violated the Fourth Amendment in two ways: (1) he lacked reasonable suspicion or probable cause for initially stopping (and, therefore, seizing) the Defendant in his vehicle; and (2) he conducted a warrantless search, unsupported by probable cause, for evidence of fraud. Analyzing each step of Deputy Valdes's actions, and what he knew at the time of each step, I find that the Defendant's arguments lack merit.

A.  Initial Stop

Deputy Valdes's initial stop of the Defendant's vehicle did not violate the Fourth Amendment because Deputy Valdes had reasonable suspicion for the stop. "A traffic stop for a suspected violation of law is considered a seizure of the vehicle's occupant and must be conducted in accordance with the Fourth Amendment." *United States v. Braddy*, No. 19-12823, 2021 WL 3876938, *5 (11th Cir. Aug. 31, 2021) (citing *Heien v. North Carolina*, 574 U.S. 54, 60 (2014)). "To justify this type of seizure, however, officers need only reasonable suspicion — that is, a particularized and objective basis for suspecting the particular person stopped of breaking the law." *Id.* (internal quotations omitted) (quoting *Heien*, 574 U.S. at 60).

Reasonable suspicion requires that the detaining officer have "a particularized and objective basis" for suspecting legal wrongdoing based on the "totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "[T]he concept of reasonable suspicion is somewhat abstract," and the Supreme Court has "deliberately avoided reducing it to a neat set of legal rules." *Id*. at 274 (internal citations omitted). "Reasonable suspicion demands 'considerably less' than probable cause, but 'the police are required to articulate some minimal, objective justification for the stop.'" *United States v. Webster*, 314 F. Appx. 226, 229 (11th Cir. 2008) (quoting *United States v. Mikell*, 102 F.3d 470, 475 (11th Cir. 1996)). "In forming reasonable suspicion, an officer may rely on information provided by a police bulletin to justify an [investigatory] stop." *Id*. (citing *United States v. Hensley*, 469 U.S. 221, 232 (1985)).

Deputy Valdes had reasonable suspicion to stop the Defendant's vehicle based on the BOLO he received.  The BOLO provided Deputy Valdes with several pieces of information about the vehicle suspected of being involved in criminal activity.  The BOLO identified the vehicle's color (white), it's make (Mazda), it's location (7920 Hampton Boulevard), and a description of the

operator's suspicious activity (driving around trying to open other vehicles' doors). When Deputy Valdes observed and stopped the Defendant's vehicle, the vehicle matched the description of a white Mazda in the reported location. Furthermore, Deputy Valdes observed the vehicle driving around the location's parking lot, which was consistent with the BOLO. Crucially, Deputy Valdes observed the vehicle at this location merely three minutes after receiving the BOLO from the dispatcher. The combination of all these circumstances – the description of the vehicle, the location, the timing, and the car's movement – gave Deputy Valdes the "minimal, objective justification" to initiate a stop. *See Webster*, 314 F. Appx. at 229.

      The Defendant argues that the description of a "white Mazda" was too vague or general to support reasonable suspicion, suggesting that finding otherwise would allow law enforcement to stop anyone driving such a common vehicle. However, a review of analogous cases indicates that the combination of information known to Deputy Valdes here was sufficient. In *Webster* an officer received a BOLO for a "dark-colored vehicle with something to the effect of 'Down South Customs' written on the rear window" that allegedly had been involved in a shooting earlier that day. 314 Fed. Appx. at 227. Approximately an hour-and-a-half to two hours later, the officer observed and stopped a blue vehicle with a decal reading "Down and Dirty Customs" on it. *Id.* The Eleventh Circuit rejected Webster's argument (nearly identical to the Defendant's here) that the BOLO description was "too vague to provide a minimal, objective justification for the *Terry*[10] stop because there are too many vehicles that could have matched the description." *Id.* at 229. While noting that the BOLO was "far from a model of clarity," the Eleventh Circuit found that the description was not "prohibitively vague." *Id.* In so finding, the Eleventh Circuit noted that it was not a case where the BOLO had only given the color of a vehicle and found that the color in

---

[10] *Terry v. Ohio*, 392 U.S. 1 (1968).

combination with the description of the decal "sufficiently narrow[ed] the field of suspected vehicles so as to support reasonable suspicion for a *Terry* stop." *Id*.

The BOLO description in this case is, in some respects, more detailed than the BOLO in *Webster*. Here, in addition to the vehicle's color, Deputy Valdes had the make and location of the vehicle, along with a description of what the vehicle was doing. Moreover, Deputy Valdes arrived at the location mere minutes after the BOLO was issued, giving the location information and the fact that the car was moving around the parking lot, significant effect in narrowing the scope of suspected vehicles. In *Webster*, the officer lacked the same locational and temporal proximity to the incident under investigation with which to evaluate whether he was observing the correct vehicle. The Defendant correctly argues that the BOLO in *Webster* had an important detail – the decal with text – that this case lacks. It is true that having that specific (relatively unique) detail narrowed the scope of suspected vehicles and distinguished the suspected vehicle from other similarly-colored vehicles more than combining make and color (as here). However, the fact that Deputy Valdes observed the Defendant's vehicle at the reported location minutes after the report was made (and driving around the parking lot, as the suspected vehicle was reportedly doing, as opposed to sitting idly) provided the same kind of scope-narrowing detail present in *Webster*. Had the Deputy observed a white Mazda hours later or at a different location, the calculus may have been different. But given the location and temporal proximity, Deputy Valdes had reasonable suspicion here.

The facts here are also similar to those in *United States v. Johnson*, 192 Fed. Appx. 935 (11th Cir. 2006). In that case, the Eleventh Circuit found that an officer had reasonable suspicion based on a BOLO for "two black males in a white Malibu" suspected of a bank robbery. *Id*. There, the stopping officer observed the suspected vehicle approximately 1.7 miles from the

robbery site. *Id.* Again, the facts supporting reasonable suspicion here are both somewhat weaker and somewhat stronger than in *Johnson*. The BOLO in *Johnson* had one piece of information that the BOLO here lacks (a general description of the vehicle's occupants). However, here the Defendant's vehicle was found at the exact location of the reported conduct minutes later, as opposed to 1.7 miles away. Ultimately, while the facts are not precisely analogous, the finding that the facts in *Johnson* were sufficient for reasonable suspicion supports a similar finding here.

The Government also argued that Deputy Valdes's traffic stop was justified by probable cause to believe that the Defendant had committed a traffic violation, specifically the failure to wear a seatbelt in violation of section 316.614(4)(b), Florida Statutes (2020). Although the Court need not reach this issue, given the above reasonable suspicion analysis, Deputy Valdes's observation of the seat belt infraction provides an alternative justification for the stop.

In his Motion, the Defendant acknowledged that an officer may temporarily detain a motorist if he has probable cause to believe that a traffic violation has occurred (DE 12 at 4 (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)) but argued that "Frage was not operating a motor vehicle on a road or highway."[11] *Id*. However, at the evidentiary hearing, the Defendant appeared to abandon this argument. He argued instead that the Deputy had not actually observed him failing to wear a seatbelt and that the Deputy had stopped him in order to investigate the BOLO, not to cite him for a traffic infraction. When asked whether, assuming I found that Deputy Valdes had observed the Defendant failing to wear his seatbelt, such observation would justify the

---

[11] The Defendant did not elaborate on this argument. It is possible that the Defendant meant that he was not in violation of the statute because the Defendant was operating his vehicle in a parking lot, whereas the statute defines "motor vehicle" as "a motor vehicle operated on the <u>roadways, streets, and highways</u> of this state." *See* § 316.614(3)(a), Fla. Stat. (2020) (emphasis added). Yet the Defendant provided no authority interpreting the application of this statute to vehicles being driven in parking lots nor explained why the statute should be interpreted in his favor. For its part, the Government did not address this potential argument; rather it simply asserted that the Defendant was in violation of the statute for failing to wear his seat belt.

traffic stop, defense counsel conceded it would. As described above, I credit Deputy Valdes's testimony that he observed the Defendant not wearing a seat belt when their vehicles came "nose-to-nose" as the Defendant sought to exit the parking lot.

The Defendant's argument that the observed seat belt violation cannot justify the traffic stop because Deputy Valdes was actually stopping him to investigate the BOLO is incorrect. The Supreme Court has made clear that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis" and that the "constitutional reasonableness of traffic stops" does not "depend[] on the actual motivations of the individual officers involved." *Whren*, 517 U.S. at 813; *see United States v. Alston*, 598 F. Appx. 730, 733-734 (11th Cir. 2015); *United States v. Jones*, 377 F.3d 1313, 1314 (11th Cir. 2004). Thus, even if Deputy Valdes's interest in the Defendant's vehicle and his motivation for stopping it sprang from a desire to investigate the potential burglary activity described in the BOLO, that subjective intent does not invalidate a stop where the circumstances, viewed objectively, would otherwise allow him to do so. Thus, even if Deputy Valdes lacked reasonable suspicion to stop the Defendant's vehicle for the suspected attempted burglary activity, the stop was justified based on probable cause for the seat belt infraction.

B. <u>Search of the Vehicle</u>

The Defendant also argues that, even if the initial stop of his vehicle was justified, the evidence of fraud found during the warrantless search of his vehicle must be suppressed. While the Defendant conceded that Deputy Valdes likely had probable cause to search the vehicle for marijuana, he argues that Deputy Valdes impermissibly broadened that search into a search for evidence of fraud. However, examining Deputy Valdes's actions step-by-step, I find suppression of the evidence is not warranted. As explained more fully below, within the appropriate bounds

of his search for marijuana, Deputy Valdes observed the items constituting evidence of fraud. To the extent it was not obviously apparent that some of those items were evidence of fraud without close examination, the first items he observed (credit cards and identification cards) were obviously incriminating and gave rise to probable cause to believe the vehicle contained evidence of fraud. Once he had such probable cause, the same "automobile exception" that permitted Deputy Valdes to search for evidence of marijuana possession also permitted him to search for evidence of fraud.

The Fourth Amendment generally requires law enforcement officers to obtain a warrant before conducting a search, but there are certain exceptions to this requirement. *United States v. Delva*, 922 F.3d 1228, 1243 (11th Cir. 2019) (citing *United States v. Watts*, 329 F.3d 1282, 1284 (11th Cir. 2003)). One such exception is the "automobile exception." *Id.* Under this exception, "[t]he police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991). "For a warrantless search of an automobile to be constitutional, '(1) the automobile must be readily mobile, and (2) there must be probable cause to believe that it contains contraband or evidence of a crime.'" *Delva*, 922 F.3d at 1243 (quoting *United States v. Lanzon*, 639 F.3d 1293, 1299-300 (11th Cir. 2011)).

As to the mobility requirement, "the car must simply be operational." *United States v. Alston*, 598 F. Appx. 730, 734 (11th Cir. 2015) (citing *United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007)). As to the second element, "probable cause exists to conduct a warrantless search when 'there is a fair probability that contraband or evidence of a crime will be found in the vehicle' under the totality of the circumstances." *Delva*, 922 F.3d at 1243 (quoting *United States v. Tamari*, 454 F.3d 1259, 1261-62 (11th Cir. 2006)). Although ultimately a legal determination,

probable cause is "a common-sense assessment based on the factual and practical considerations of everyday life." *United States v. Reeves*, 604 F. Appx. 823, 826-827 (11th Cir. 2015) (citing *United States v. Smith*, 459 F.3d 1276, 1291 (11th Cir. 2006)). Furthermore, "[o]nce probable cause exists to search the vehicle, police may search all parts of the vehicle, and any containers therein, where the object of the search might be found." *United States v. Baldwin*, 774 F.3d 711, 720 (11th Cir. 2014) (citing *Wyoming v. Houghton*, 526 U.S. 295, 301 (1999)).

Deputy Valdes's warrantless search of the Defendant's vehicle satisfied both elements of the automobile exception. There is no question that the Defendant's vehicle was mobile, as Deputy Valdes observed the Defendant driving it immediately before the stop. Moreover, after his first few moments of interacting with the Defendant, Deputy Valdes had probable cause to believe that evidence of a crime would be found in the car, specifically evidence of possession of marijuana. When Deputy Valdes first approached the Defendant's vehicle and the Defendant opened the driver's door, Deputy Valdes smelled (and recognized) the odor of marijuana and observed two burnt marijuana cigarettes in the center console area. The Defendant also admitted having smoked marijuana earlier (although he denied having it in the car). These facts gave Deputy Valdes probable cause to search the vehicle for marijuana.[12] *See United States v. Cheeks*, 795 F. Appx. 805, 811-812 (11th Cir. 2019) ("Our precedent makes clear that an officer's level of suspicion rises to the level of probable cause when he detects 'what he [knows] from his law enforcement experience to be the odor of marijuana.'") (quoting *United States v. Tobin*, 923 F.2d

---

[12] Prior to the search of the vehicle, the deputies also conducted a "pat down" and found a small amount of marijuana in the Defendant's pocket. While the Defendant's Motion mentions that he was ordered out of the car, handcuffed, and patted down within seconds of his encounter with Deputy Valdes, he does not squarely address the propriety of these actions separate and apart from the stop of the vehicle itself. Nor does the Government address whether the pat down was constitutional, although Deputy Valdes testified that the Defendant was handcuffed for "officer safety." Because the parties do not squarely address the issue, I make no finding regarding the constitutionality of the pat down. However, I find that Deputy Valdes had probable cause to search the vehicle without reference to the marijuana in the Defendant's pocket.

1506, 1512 (11th Cir. 1991)); *Merricks v. Adkisson*, 785 F.3d 553, 560 fn. 3 (11th Cir. 2015) ("Moreover, the smell of burnt marijuana emanating from a vehicle is sufficient probable cause to search a vehicle." (citing *Tobin*)). Therefore, Deputy Valdes was permitted to conduct a warrantless search of the vehicle for evidence of marijuana possession.

The Defendant argues that, even if Deputy Valdes had probable cause to search the vehicle for marijuana, Deputy Valdes impermissibly exceeded the scope of his search for narcotics by scrutinizing the credit cards, mail, receipts, and other items in the vehicle. However, a close examination of Deputy Valdes's actions shows that his search was valid. First, it is clear that once Deputy Valdes had probable cause to search for marijuana, the automobile exception allowed him to search all areas and containers of the vehicle where marijuana might be found. *See Baldwin*, 774 F.3d at 720. Given the size and form of marijuana, there are likely few readily accessible areas of the vehicle within which marijuana could not be found. Almost immediately upon leaning into the vehicle to begin his search, Deputy Valdes observed multiple (at least five and, ultimately, more than thirty) identification and credit cards bearing other people's names. Although Deputy Valdes did not testify as to precisely where in the vehicle he found the cards, it is apparent from the speed with which he observed them and the view from the body camera (which was pointing at the back rest of the driver's seat) that they were in either the passenger seat area or the center console area. Thus, Deputy Valdes was permitted to be searching the space he was searching when he observed the cards. The same could be said of the mail and receipts, and he was permitted to move or manipulate these items to ensure that they were not concealing narcotics. *See Reeves*, 604 F. Appx. at 827-28 (officer searching for narcotics permitted to open and flip through notebook). The deputies were also allowed to open the trunk, where they immediately found the credit card embosser.

To the extent that Deputy Valdes needed to scrutinize the receipts or mail – beyond what was necessary to understand that they did not conceal narcotics – in order to recognize them as evidence of fraud,[13] such scrutiny was justified once he found the credit cards and identifications (which were more obviously evidence of fraud) in plain view. Under the plain view doctrine, an officer may seize an item if they are lawfully in a place from which they can plainly view the item and the incriminating character of the item is immediately apparent. *Smith*, 459 F.3d at 1290 (citing *Horton v. California,* 496 U.S. 128, 136–37 (1990); *United States v. Hromada,* 49 F.3d 685, 690 n. 11 (11th Cir.1995)). To the extent that the Defendant implies (by using the word "scrutinize") that the incriminating nature of the credit cards and identification cards was not sufficiently obvious, identifying the names on such items and therefore recognizing them as evidence of fraud requires no scrutiny beyond what is obvious on their face. *See Baldwin*, 774 F.3d at 720 (mail and debit cards in others' names in plain view sufficient to establish probable cause for search of identity theft and tax fraud).

Here the Eleventh Circuit's opinion in *Reeves* is instructive. In *Reeves*, a highway patrolman stopped a car for traffic infractions and developed probable cause to search for narcotics after a K9 alert on the vehicle. 604 F. Appx. at 825. During the search for narcotics, the patrolman found a backpack in the trunk, containing a laptop, a notebook, thirty credit cards, and medical records. *Id.* The patrolman flipped through the notebook and observed ledgers of names with corresponding social security numbers and dates of birth. *Id*. Suspecting fraud, he then conducted a more thorough search of the backpack, looking through the notebook and laptop computer for both narcotics and fraud. *Id*. The Eleventh Circuit rejected Reeves's contention that the patrolman was not permitted to open the notebook or flip through the pages of medical

---

[13] No such argument could be made about the credit card embosser found in the trunk, whose incriminating nature was immediately obvious.

records as part of his search for narcotics and distinguished the circumstances from *Arizona v. Hicks*, 480 U.S. 321 (1987), on which the Defendant here also relies.[14]  *Id*. at 827-828.  During that cursory review of the notebook, the patrolman was able to "obviously" see the handwritten names, dates of birth, and social security numbers.  *Id*.  That information, combined with the credit cards and laptop "were sufficient to establish probable cause to believe that the backpack contained evidence of tax fraud or identity theft."  *Id*. at 828.  Implicit in the Eleventh Circuit's ruling was the notion that the patrolman's gleaning of the information contained in the pages of the notebook did not require scrutiny that amounted to a "new invasion of the defendant's privacy" beyond what was authorized by the combination of his narcotics search and the plain view doctrine.  Similarly, here, the information that Deputy Valdes was able to glean by glancing at the credit cards and identifications was in plain view.

Deputy Valdes immediately recognized that possession of the number of identifications and credit cards he saw was evidence of "a felony," as he is heard saying on the body camera footage.[15]  Once Deputy Valdes had discovered these items, he had probable cause to believe that the vehicle also contained evidence of fraud.  In coming to this conclusion, it is also important to consider two other facts known to Deputy Valdes at the time of his discovery of the credit cards and identifications.  First, before Deputy Valdes began his search, the dispatcher relayed the license plate number of the suspected white Mazda from the initial 911 call, which Deputy Valdes confirmed to match the license plate on the Defendant's vehicle.  This fact further solidified Deputy Valdes's original suspicion that the Defendant's vehicle was the one involved in driving

---

[14] By the same reasoning, to the extent that Deputy Valdes needed to move the credit cards and identifications he saw before seeing the names on them, moving those items to see what may have been hidden between or underneath them was within the permissible scope of his search for marijuana.

[15] As the Government noted in its argument, under Florida law, "Proof that a person used or was in possession of the personal identification information of five or more individuals, unless satisfactorily explained, gives rise to an inference that the person who used or was in possession of the personal identification information did so knowingly and intentionally without authorization."  § 817.5685(3)(b)1., Fla. Stat. (2020).

around attempting open other cars' doors.[16]  As the Deputy alluded to in his testimony, attempted vehicle break-ins are often associated with attempts to steal mail or other identifying documentation for conducting fraud.  Second, the vehicle contained a large television (as the Defendant mentioned at the beginning of the stop), which is a relatively expensive item that could potentially be the fruits of a fraudulent purchase.

Once Deputy Valdes had probable cause to believe that evidence of fraud was present, he was permitted, under the automobile exception, to search the vehicle for additional evidence of fraud.  Thus, to the extent that the mail and the receipts in the vehicle were not obviously incriminating within the parameters of the plain view doctrine, and required more scrutiny to determine their incriminating character beyond that which was necessary to determine they did not conceal narcotics, reviewing them closely was permissible as a search for evidence of fraud.  As described by the Eleventh Circuit in *Reeves*, where the patrolman's search began as one for narcotics and became a search for both narcotics and evidence of fraud, it was not "relevant that [the patrolman] did not suspect Reeves of fraud before he opened the backpack, because this is precisely the type of situation in which the plain-view doctrine applies – where, during the course of a lawful search, the officer discovers evidence of another crime that was not the object of the search."  604 F. Appx at 828.

The Defendant's argument that the deputies could have (and, impliedly, were required to) obtain a warrant in order to search for evidence of fraud ignores that the automobile exception continued to apply after the initial evidence of fraud was found in plain view.  After all, the vehicle remained mobile and Deputy Valdes had probable cause to believe that evidence of fraud would

---

[16] To be clear, because the license plate information was not relayed until after the Defendant was stopped, I have not considered it in determining whether Deputy Valdes had reasonable suspicion for the stop.  However, the information is nonetheless relevant to considering whether Deputy Valdes subsequently had probable cause (after observing the credit cards and identifications) to believe that the vehicle contained evidence of fraud.

be found in the car. No further exigency preventing the officers from seeking a warrant was necessary. *See Alston*, 598 F. Appx. at 734 n. 3 (stating that the ready mobility of a vehicle permitted warrantless search without the need for further exigent circumstances) (citing *United States v. Johns*, 469 U.S. 478, 484 (1985) and *Lindsey*, 482 F.3d at 1293 n. 6). Thus, Deputy Valdes seized all of the evidence of fraud pursuant to a valid warrantless search.

### III.  CONCLUSION

For the foregoing reasons, I respectfully RECOMMEND that the Defendant's Motion to Suppress [DE 12] be **DENIED**.

The parties will have **seven**[17] (7) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Rodolfo A. Ruiz, II, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary, in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 4th day of October, 2021.

*[signature]*
JARED M. STRAUSS
UNITED STATES MAGISTRATE JUDGE

---

[17] At the evidentiary hearing, both parties agreed to shortening the objection period to seven days.